IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

AGENDIA, INC.,

*Plaintiff-Appellee/ Cross-Appellant*,

v.

ALEX M. AZAR II, Secretary,
United States Department of Health and Human Services,

*Defendant-Appellant/ Cross-Appellee*.

---

On Appeal from the United States District Court
for the Central District of California,
No. SA CV 19-0074 DOC (JDEx)
District Judge David O. Carter

---

**BRIEF FOR APPELLEE/ CROSS-APPELLANT AGENDIA, INC.**

---

Patric Hooper (SBN 57343)
HOOPER LUNDY & BOOKMAN PC
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
phooper@health-law.com

*Counsel for Appellee/ Cross-Appellant AGENDIA, INC.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee/Cross-Appellant Agendia, Inc. states as follows:

Agendia, Inc. is a private company and is not owned by a company whose stock is publicly traded.

s/_____
Patric Hooper (SBN 57343)
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

I.     RESPONSE BRIEF INTRODUCTION..........................................................1

II.     STATEMENT OF THE CASE ......................................................................2

     A.     Statutory and Regulatory Framework ....................................................2

     B.     The Present Litigation ...........................................................................4

III.     SUMMARY OF ARGUMENT....................................................................6

IV.     ARGUMENT.............................................................................................8

     A.     The LCD and the MolDX Program Policies Trigger the Promulgation Requirements of Section 1395hh. .................................8

     B.     The Secretary's Newly Raised Administrative Feasibility Arguments Should Be Rejected. .........................................................13

     C.     The Existence of Additional Promulgation Requirements Beginning in 2016 Is Not Relevant to the Issuance of LCD L32288 and Its Related Policies in 2011.............................................14

V.     RESPONSIVE BRIEF CONCLUSION.......................................................17

VI.     PRINCIPAL BRIEF INTRODUCTION ......................................................17

VII.     STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION .......................................................................................17

VIII.     STATEMENT OF THE ISSUE ..................................................................18

IX.     STATEMENT OF THE CASE ...................................................................18

     A.     Statutory and Regulatory Framework .................................................18

     B.     The Present Litigation .........................................................................20

X.     SUMMARY OF ARGUMENT..................................................................21

XI.     STANDARD OF REVIEW........................................................................23

XII. ARGUMENT ..............................................................................................24

    A.    Congress May Not Delegate Discretionary Policymaking
            Authority to Private Entities ...............................................................24

    B.    There Is Not Sufficient Independent Check by the Secretary on
            MACs Establishment of LCDs to Allow the Delegation in This
            Case ....................................................................................................26

XIII. PRINCIPAL BRIEF CONCLUSION ........................................................29

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

5977450.1

# TABLE OF AUTHORITIES

## Cases

*United States ex rel. Alt v. Anesthesia Servs. Assocs, PLLC*,
No. 16-cv-0549, 2019 U.S. Dist. LEXIS 223011 (M.D. Tenn. Dec. 31, 2019) ...................................................................................28

*Ass'n of Am. R.R. v United States DOT*,
721 F.3d 666 (D.C. Cir. 2013), *rev'd and vacated on other grounds, DOT v. Ass'n of Am. R.R.,* 135 S. Ct. 1225 (2015) .......................24, 25

*Azar v. Allina Health Services*,
139 S. Ct. 1804 (2019).......................................................7, 8, 11, 12

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)...............................................................24

*Erringer v. Thompson*,
371 F.3d 625 (9th Cir. 2004) .......................................................7, 10

*Gentiva Healthcare Corp. v. Sebelius*,
723 F.3d 292 (D.C. Cir. 2013)...............................................24

*H. Baban, M.D., Inc. v. Azar*,
798 Appx. 56 (9th Cir. 2019)....................................................3

*Hays v. Sebelius*,
589 F.3d 1279 (D.C. Cir. 2009)..............................................25, 26

*Hilton v. Mumaw*,
522 F.2d 588 (9th Cir. 1975) .......................................................1, 18

*Int'l Rehabilitative Scis*., *Inc*. v *Sebelius*,
688 F.3d 994 (9th Cir. 2012) ...................................................23

*United States ex rel. Jeter v. Myriad Genetics, Inc.*,
No. 17-cv-2945 (D.S.C. 2017)..................................................27

*In the Matter of Lisse*,
905 F.3d 495 (7th Cir. 2018) ....................................................6

iv

*Port of Seattle v. FERC*,
499 F.3d 1016 (9th Cir. 2007) ........................................................18

*Sandvig v. Sessions*,
315 F. Supp. 3d 1 (D. D.C. 2018)....................................................25

*Vista Hill Foundation, Inc. v. Heckler*,
767 F.2d 556 (9th Cir. 1985) ..........................................................11

**Statutes**

5 U.S.C. 553 ...........................................................................*passim*

5 U.S.C. 706 ...................................................................................23

42 U.S.C. 1395ff(b)(1)(A) ...............................................................23

42 U.S.C. 1395ff(c)(3)(B)(ii)(II) ........................................................9

42 U.S.C. 1395ff(f)(2)(C) .............................................................4, 19

42 U.S.C. 1395hh..............................................................7, 11, 12, 16

42 U.S.C. 1395hh(a) ...............................................................*passim*

42 U.S.C. 1395hh(a)(2)............................................................*passim*

42 U.S.C. 1395kk-1(a)(4) ...............................................................19

42 U.S.C. 1395kk-1(d) ....................................................................29

42 U.S.C. 1395m-1(d)(5) ...................................................................3

42 U.S.C. 1395m-1(g) .....................................................................19

42 U.S.C. 1395m-1(g)(1)(C).........................................................4, 16

42 U.S.C. 1395u(a) .....................................................................18, 19

42 U.S.C. 1395y...............................................................................20

42 U.S.C. 1395y(l)(5)(A)..................................................................14

42 U.S.C. 1395y(*l*)(5)(D) ...................................................16, 20

42 U.S.C. 1395ff(f)(2)(C) .........................................................19

42 USC 1395m-1(d)(5) ..............................................................3

False Claims Act .................................................................27, 28

Medicare Act Amendments ........................................................8

## Regulations

42 C.F.R. 405.1062 ..................................................................2, 9

42 C.F.R. 405.1062(b) ................................................................26

42 C.F.R. 405.1062(c) ..................................................3, 6, 9, 26

42 C.F.R. 426.110 ..................................................................19, 20

42 C.F.R. 426.310 ..................................................................19, 20

42 C.F.R. 426.320 .....................................................................19

42 C.F.R. 426.325(a) ................................................................19

42 C.F.R. 426. 330 ................................................................19, 20

42 C.F.R. 426.431 ..................................................................19, 20

## Legislative Material

H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. 350-51 (1986) ............................15

5977450.1

# I.    RESPONSE BRIEF INTRODUCTION[1]

Agendia, Inc. ("Agendia") is a clinical laboratory located in Irvine,

California that furnishes molecular diagnostic testing ordered by outside physicians

for the treatment of their patients suffering from breast cancer.  With the advent of

molecular diagnostic testing, "one size fits all" is no longer the standard protocol

for cancer patients, especially breast cancer patients.  Among other benefits, such

testing means that not every breast cancer patient must endure the rigors of

chemotherapy and other harsh treatment.

The two tests at issue, "BluePrint" and "TargetPrint," were developed

exclusively by Agendia.  The tests thus cannot be ordered or obtained from any

other laboratory in the Country.  And, as evidenced by the 86 patients in this

appeal, physicians from across the nation order the testing for their patients.  It is

thus misleading to suggest that the Medicare Administrative Contractor's

("MAC's") policy at issue, a Local Coverage Determination ("LCD") issued by a

private contractor in South Carolina, Palmetto GBA, has only *limited* impact on

Medicare beneficiaries and on Agendia.

---

[1] The cross-appeal of Agendia, Inc. is a conditional cross-appeal of the type permitted by this Court.  *See*, *e.g.*, *Hilton v. Mumaw*, 522 F.2d 588, 603 (9th Cir. 1975).  If the Court affirms the district court's basis for granting summary judgment, it will be unnecessary to decide the delegation issue raised in the cross-appeal.  Thus, rather than proceeding first with its "principal" brief, Agendia, Inc. proceeds first with its response brief.

1

It is equally misleading to argue, as the Secretary does, that Medicare statutory amendments issued in 2016 should determine the validity and enforceability of an LCD issued by a MAC in 2011 for testing performed between July 2012 and January 2013. Rather, the law in effect at the time the MAC established and applied the LCD should control the outcome.

This case involves a single LCD, LCD L32288 (Supp. E.R. at 1-6), that has had an outsized effect on laboratories furnishing molecular diagnostic testing. The case does *not* involve all Medicare LCDs or even all LCDs that affect Medicare coverage for diagnostic laboratory services.

## II.    STATEMENT OF THE CASE

### A.    Statutory and Regulatory Framework

In addition to those included in the brief of the Secretary of Health and Human Services ("Secretary"), additional statutory and regulatory provisions must be highlighted, and those that are not included in the addendum to the Secretary's brief are included in the addendum to this brief.

For example, the Secretary stresses throughout his brief that LCDs and other MAC policies are not binding on his Administrative Law Judges ("ALJs") or on his Medicare Appeals Council. Citing to 42 C.F.R. 405.1062, he explains that even though the ALJs and Appeals Council must give MAC policies "substantial

deference," they do not have to follow them so long as they explain why. Dkt. 16, pages 10-11 of 45.

However, the Secretary does not mention that in a Medicare supplier claims appeal (which is the only appeal route available to Agendia), neither an ALJ nor the Appeals Council is allowed to set aside or review the validity of an LCD pursuant to this same regulation. *See* 42 C.F.R. 405.1062(c). Such a remedy is only available to a Medicare beneficiary, who is unlikely to have the financial or other incentive to challenge the validity of an LCD affecting a one-time laboratory test. Thus, as is the situation here, in the Medicare claims appeal process, a laboratory must constantly re-challenge the applicability of an LCD for *each* claim submitted for each beneficiary tested.[2]

The Secretary characterizes a molecular diagnostic test as an "advanced diagnostic laboratory test," which means a test offered or furnished only by a single laboratory and not sold for use by a laboratory other than the original developing laboratory. Such testing is an analysis of multiple biomarkers of DNA, RNA, or proteins combined with a unique algorithm to yield a single patient-specific result. *See* 42 USC 1395m-1(d)(5). And, the review of LCDs issued for

---

[2] And, as here, the administrative appeal process, itself, takes many years to exhaust due to a massive backlog of cases at the ALJ level. *See H. Baban, M.D., Inc. v. Azar*, 798 Appx. 56, 58 (9th Cir. 2019).

5977450.1

such laboratory tests on and after January 1, 2015 is addressed separately by Congress under 42 U.S.C. 1395m-1(g)(1)(C). *See also* 42 U.S.C. 1395ff(f)(2)(C).

## B. The Present Litigation

LCD L32288 is entitled, "Molecular Diagnostic Tests." Supp. E.R. at 1-6. This LCD states that "Palmetto [the MAC] will consider all [molecular diagnostic tests] investigational and therefore not a [Medicare] covered service," prior to "Technology Assessments" by the MAC. LCD, page 2, E.R. 2. In November 2011, Elaine Jeter, the Medical Director for Palmetto, founded and directed Palmetto's Molecular Diagnostic Services Program ("MolDX") to perform the Technology Assessments. *See* Exhibit A to Agendia's reply brief below, Jeter complaint paras. 8, 38. Supp. E.R. at 12, 17-18. The MolDX program has since been incorporated into contracts with various other MACs covering more than half of the states and territories. Jeter complaint, para. 40, Supp. E.R. at 18.

Palmetto, the MAC for Agendia, denied coverage for Agendia's claims for payment for the testing of the 86 Medicare beneficiaries here based solely on the policy of LCD L32288, denying coverage for any molecular diagnostic test that was not approved by the MolDX program. The denials were upheld at the next two administrative appeal steps based on LCD L32288 and its related policies. Agendia then requested a hearing before an ALJ.

5977450.1

Based on undisputed expert testimony, the ALJ found that the "genetic testing provided to the beneficiaries in these cases were medically reasonable and necessary." Specifically, the ALJ concluded that the medical literature shows that "molecular subtyping of early stage breast cancer is more accurate and helpful in selecting treatment options than conventional subtyping." The testing was "more precise in identifying the type or classification of the individual's cancer, and accordingly, more precise in how to effectively treat the type of cancer in that individual." Based on the record of the hearing, the ALJ found "that the BluePrint and TargetPrint tests were effective in allowing doctors to make more precise educated decisions on how to treat their patients on a long-term basis and potentially minimize their exposure to harmful chemotherapy drugs." E.R. at 48-49.

On its own motion (prompted by prodding by a different MAC), the Appeals Council chose to review the ALJ's decision. After recounting the record of the previous administrative steps, the Appeals Council held that the ALJ erred as a matter of law by not deferring to the LCD and the MolDx program. The Appeals Council found "no reason to not apply substantial deference to the LCD or to question the MolDX program's findings." The Appeals Council concluded that the

"ALJ's departure from the LCD was a result of its misapplication and misunderstanding of the MolDX program."  E.R. at 55.

As mentioned above, Agendia is limited to challenging LCD L32288 and its successor LCDs through the Medicare claims appeals process, which process does *not* allow ALJs or the Appeals Council to rule on the validity of LCDs under 42 C.F.R. 405.1062(c).  Indeed, as recently as May 29, 2020, a different ALJ issued a decision involving Agendia's BluePrint and TargetPrint testing for 150 other Medicare beneficiaries.  While the ALJ found that the testing "indeed benefitted the course of cancer treatment for the 150 beneficiaries," he chose to defer to LCD L32288 and its successor LCD L33541, both of which use Palmetto's MolDX program policy to perform technical assessments, and thus issued an "Unfavorable" decision.  Supp. E.R. at 36.[3]

## III.  SUMMARY OF ARGUMENT

LCD L32288 and its technical assessment program, the MolDX program, establish substantive Medicare coverage policy governing the scope of benefits available to Medicare beneficiaries.  Because they were not enacted as regulations,

---

[3] The May 29, 2020 ALJ decision is the ninth decision involving the same issues.  Agendia respectfully requests the Court to take judicial notice of this latest ALJ decision.  The proper place to ask for judicial notice in a court of appeals is in the brief.  *In the Matter of Lisse*, 905 F.3d 495 (7th Cir. 2018).

as required by 42 U.S.C. 1395hh(a), they are not enforceable, as the district court correctly decided.

For purposes of analyzing 42 U.S.C. 1395hh, it matters not that LCD L32288 and the MolDX program are not absolutely binding on ALJs and the Appeals Council.  They are "statements of policy" to which the Appeals Council deferred in this case.  And, the Appeals Council reversed the ALJ's decision because of the ALJ's "departure" from the MAC's statement of policies.

In ruling for Agendia, the District Court correctly applied and relied on *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019) ("*Allina*").  The Secretary's attempt to distinguish *Allina* is unavailing.  The facts that the policies were established by a private contractor, not the Secretary, and were the basis for the Appeals Council's decision in this case, demonstrate the agency's lack of supervision of critical policy making, rather than provide a meaningful basis for distinguishing *Allina.*

The Secretary's heavy reliance throughout his brief on this Court's decision in *Erringer v. Thompson*, 371 F.3d 625 (9th Cir. 2004) ("*Erringer*") is misplaced.  In fact, this Court expressly chose not to address the breadth of Section 1395hh in *Erringer.  Id.* at 633.

The amendments to the Medicare Act requiring new procedures for establishing LCDs on and after January 1, 2016, do not affect the enforceability of LCDs and other MAC policies issued prior to the amendments, as is the case with LCD L32288 and the MolDX program. If anything, the amended procedures are evidence of Congress' disapproval of the prior process for promulgating LCDs.

Finally, the Secretary's assertion that the district court's decision would have significant adverse effects on the Secretary's administration of the Medicare program is basically the same type of administrative feasibility argument embraced by the dissent and rejected by the majority in *Allina*.

## IV.  ARGUMENT

### A.  The LCD and the MolDX Program Policies Trigger the Promulgation Requirements of Section 1395hh.

Palmetto's LCD L32288 and its MolDX Program (and policy articles) establish Medicare Program policies governing Medicare coverage and payment for molecular diagnostic testing. The Appeals Council expressly held that "[i]n accordance with the LCDs and policy article, the Council concludes that both the

BluePrint or (*sic*) TargetPrint tests are not covered and we reverse the ALJ's decision." E.R. 56.[4]

LCD L32288 entitled, "Molecular Diagnostic Tests (MDT)," states unequivocally that "Palmetto will consider all [MDT] tests investigational and therefore, not a covered service" until and unless the test meets the clinical utility criteria of Palmetto's technology assessment, which is the function of its MolDX program.

While not absolutely binding on ALJs and the Appeals Council, the Secretary requires the ALJs and Appeals Council to give LCDs "substantial deference" if they are applicable to a particular case. If an ALJ or the Appeals Council declines to follow a policy in a particular case, the ALJ or Appeals Council "must explain the reasons why the policy was not followed." And, neither an ALJ nor the Appeals Council may set aside or review the validity of an LCD for purposes of a claim appeal, such as is the case here. 42 C.F.R. 405.1062(c).[5]

---

[4] Palmetto's "policy articles" simply repeat the findings of the MolDX Program. E.R. 50. If the LCD and the MolDX policies are unenforceable, the articles are also of no effect.

[5] The Secretary points out that 42 U.S.C. 1395ff(c)(3)(B)(ii)(II) states LCDs are not binding on qualified independent contractors in the independent review step of the process, the step prior to the ALJ stage. Dkt.16, pages 21-22 of 48. However, the Secretary ignores the next sentence of this same provision that states: "Notwithstanding the previous sentence, the qualified independent contractor shall consider the local coverage determination in making such decision."

Citing from *Erringer* (Dkt. 16, at 22 of 48), for APA notice-and-comment rulemaking purposes, the Secretary characterizes an LCD as an "interpretation" of the Medicare reasonable and necessary requirement on a contractor-wide basis. Even assuming this characterization is accurate, it does not exempt LCD L32288 from the promulgation requirements of Section 1395hh(a), as discussed below.

Suggesting that LCD L32288 has only limited application is also misleading, as mentioned above. Agendia's tests are advanced diagnostic laboratory tests, meaning they are furnished only by Agendia and are not sold for use by Agendia to other laboratories. Agendia's testing is therefore only available to doctors and their cancer patients through Agendia. As a result, as here, doctors all over the country order Agendia's testing to guide their treatment of their breast cancer patients regardless of where they reside. And, because Agendia's laboratory is situated in California, Agendia and all of the Medicare beneficiaries from across the Country whose doctors ordered the tests are subject to Palmetto's LCD and the MolDx Program.[6]

---

[6] The Medicare beneficiaries who received Agendia's testing resided in California, Illinois, New York, Oregon, Kentucky, Wisconsin, Ohio, Minnesota, Texas, Pennsylvania, Missouri, Nevada, New Jersey, Michigan, Florida, Nebraska, Connecticut, South Carolina, Indiana and Arizona. Ad. Rec. at 446, 471, 555, 584, 660, 723, 903, 968, 1035, 1096, 1225, 1321, and 2549.

Moreover, the fact that the LCD and other Palmetto policy *interpret* the controlling Medicare statutes, including the Medicare reasonable and necessary requirement, makes the resulting policy no different than any other agency rule or regulation. Agency regulations interpret the governing enabling statutes. *See Vista Hill Foundation, Inc. v. Heckler*, 767 F.2d 556, 565-66 (9th Cir. 1985) (the Secretary has broad authority to make regulations to interpret the Medicare statutes). Some agency interpretations of statutes require notice-and-comment rulemaking and others do not.

While "interpretive rules" might not have to be promulgated pursuant to the notice-and-comment rulemaking requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. 553, *Allina* expressly ruled that an interpretive rule may nevertheless be subject to the promulgation requirements of Section 1395hh. A statement of policy that establishes or changes "a substantive legal standard" is subject to Section 1395hh, even if it is considered an interpretive rule for APA rulemaking purposes. In fact, in *Allina*, the majority rejected the lone dissenter's request (based in part on *Ettinger*) to equate the APA rulemaking standards for interpretive rules with those applicable to Section 1395hh. *Allina*, 139 S. Ct. at 1814.

11

Indeed, Section 1395hh extends its promulgation requirements to "gap filling policy" that might be considered to be exempt from APA rule-making requirements. *See Allina*, 139 S. Ct. at 1817 ("We hold simply that, when the government establishes or changes an avowedly 'gap' filling policy, it can't evade its notice-and-comment obligations under §1395hh(a)(2) on the strengths of the arguments made in this case.").

The district court correctly applied *Allina* to LCD L32288, concluding that it represented an establishment of an agency standard for determining whether a particular service was covered by Medicare on a contractor-wide basis. Specifically, the LCD established that the Agendia tests would not be covered by Medicare. Dkt. 17, page 21 of 66. The district court further found that the LCD and related policies established a standard that was treated as substantive throughout the entire administrative appeal process, whether or not it was binding or entitled to substantial deference.

And, finally, the district court characterized the LCD as the kind of "gap-filling policy" that could not evade the notice-and-comment rulemaking obligations under Section 1395hh(a)(2), because the Medicare statute, itself, does not compel the determination that Agendia's tests are not reasonable and

necessary, but rather the LCD and its related policies do.  E.R. 20,  Dkt. 17, page 22 of 66.

**B.**     **The Secretary's Newly Raised Administrative Feasibility Arguments Should Be Rejected.**

The Secretary asserts for the first time on appeal that "it would make no sense for Congress to require the Secretary to engage in notice-and-comment rulemaking" with respect to a particular contractor's non-binding LCDs regarding the application of the reasonable and necessary standard.  According to the Secretary, he could not do so if there were conflicting LCDs, because he could not simultaneously conduct two hearings on the same issue.  Nor, according to the Secretary, could he issue a Federal Register notice because LCDs are not "official action(s) of the agency."  Dkt. 16, pages 26-27.

These newly raised arguments are not persuasive even if the Court were to decide to address them for the first time on appeal.  LCD L32288 and the MolDX Program are the policies at issue in this matter.  While other MACs have adopted their provisions, none have established contrary provisions as far as Agendia knows.  However, if there are conflicting policies, the Secretary would have even more reason to hold a single notice-and-comment rulemaking hearing.  Medicare is

5977450.1

*the* Federal Healthcare Program for the elderly and the disabled.  There should not be separate Medicare policies depending on where Medicare beneficiaries reside.[7]

The notion that the Secretary cannot provide notice of a hearing in the Federal Register of an LCD, because LCDs are not official actions of the agency raises more problems than it solves for the Secretary in this appeal.  If MAC policies are not official actions of the Secretary, they should have no impact on Medicare beneficiaries or on those healthcare suppliers and providers who furnish healthcare services to Medicare beneficiaries.  Medicare is a government healthcare program, not a private insurance program run by private companies.

C.     **The Existence of Additional Promulgation Requirements Beginning in 2016 Is Not Relevant to the Issuance of LCD L32288 and Its Related Policies in 2011.**

As a threshold matter, it is important to point out that Congress has exempted National Coverage Determinations from the promulgation requirements of Section 1395hh(a)(2).  Congress did so because such National Coverage Determinations have separate promulgation requirements that are similar to those of Section 1395hh(a)(2).  If Congress had intended to exempt LCDs from the

_____

[7] If there are conflicting LCDs, the Secretary should reconcile the differences as part of his plan to evaluate LCDs to determine if any should be adopted nationally under 42 U.S.C. 1395y(l)(5)(A).

requirements of Section 1395hh(a)(2), it could have, and presumably would have, expressly done so as it has for National Coverage Determinations.[8]

Despite the lack of an express exemption for LCDs in Section 1395hh(a), the Secretary argues that Congress *impliedly* exempted LCDs through the amendment of other statutes in 2016. And, according to the Secretary, these 2016 amendments should be read to have impliedly done so for LCDs issued prior to 2016, including LCD L32288, which was enacted in 2011. Dkt. 16, pages 28-32 of 48.

While the district court correctly held that the promulgation process of Section 1395hh and the new processes specific to LCDs are not mutually exclusive and each must be followed, Agendia contends there is another response, which is applicable here. LCD L32288 was issued in 2011 and is being applied here to laboratory services furnished to Medicare beneficiaries from June 25, 2012 to January 25, 2013. The processes for LCDs cited by the Secretary did not exist when LCD 32288 was issued or when the MAC denied Medicare coverage for Agendia's laboratory tests. In 2011-2013, the applicable promulgation statutes were the APA and/or Section 1395hh(a)(2).

_____

[8] According to a Conference Report, the Secretary's process for promulgating National Coverage Determinations "is designed to assure consultation with the medical and scientific community and the general public." Thus, Congress believed that the APA-type rulemaking procedures did "not seem essential." H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. 350-51 (1986).

5977450.1

The Secretary relies on procedures mandated by Section 1395y(*l*)(5)(D), which were enacted in 2016.  There are also procedural requirements for LCDs for clinical laboratory services that shall only apply to LCDs issued on or after January 1, 2015.  *See* 42 U.S.C. 1395m-1(g)(1)(C).  None of these requirements existed when Palmetto issued LCD L32288 or launched the MolDX Program in 2011.  Thus, they are not relevant to this dispute.

The Secretary provides no authority supporting the proposition that statutes enacted *after* the policies at issue were issued and applied to Agendia may be used to construe the requirements of Section 1395hh(a) in 2011-2013, when the policies were established and applied to Agendia.  The 2016 amendment adding Section 1395y(*l*)(5)(D), on which the Secretary now relies, says nothing about Section 1395hh, and, as pointed out above, Section 1395hh was not amended at any time to expressly exempt LCDs from its requirements.

The issue before the Court in this case is whether the 2011 MAC policies were required to have been promulgated as regulations under Section 1395hh(a)(2) in 2011, to be enforceable for services furnished in 2012-2013.  The question is not how LCDs must be promulgated in 2016 and onward.

## V.     RESPONSIVE BRIEF CONCLUSION

Based on the foregoing, Agendia respectfully requests that this Court affirm the district court's October 29, 2019 order granting Agendia's motion for summary judgment.

## VI.     PRINCIPAL BRIEF INTRODUCTION

If this Court reverses the district court's ruling regarding the application of Section 1395hh(a)(2) to the policies at issue, Agendia contends the Court must nevertheless uphold the October 29, 2019 order granting Agendia's motion for summary judgment on another ground.  Specifically, Agendia contends the MAC policies at issue are invalid because Congress improperly delegated regulatory policymaking to a private contractor (the MAC).

## VII.     STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

On January 10, 2020, Agendia filed a timely cross-appeal of the district court's October 29, 2019 order.  E.R. 1-2, Dkt. 17, pages 3-4 of 66.  Agendia filed its cross-appeal as a conditional cross-appeal to protect its rights should this Court

reverse the district court's ruling regarding the application of Section 1395hh(a)(2) to the policies at issue.

Because there is a risk that Agendia may become aggrieved if the Court reverses the district court's ruling, the Court has jurisdiction to entertain this cross-appeal if such a reversal occurs. *See Port of Seattle v. FERC*, 499 F.3d 1016, 1028 (9th Cir. 2007), citing *Hilton v. Mumaw*, *supra.*

## VIII. STATEMENT OF THE ISSUE

If the Court reverses the district court's ruling on the application of Section 1395hh(a)(2) to the Medicare coverage policies at issue, the issue to be resolved in this cross-appeal is whether Congress unlawfully delegated authority to private contractors, Medicare Administrative Contractors (MACs), to establish Medicare coverage policies.[9]

## IX. STATEMENT OF THE CASE

### A. Statutory and Regulatory Framework

Most of the statutory and regulatory provisions applicable to this cross-appeal are discussed above and in the Secretary's opening brief. However, the critical statutory provisions on the delegation issue are 42 U.S.C. 1395u(a) and

---

[9] Agendia had also raised an issue regarding compliance with the APA in its cross-appeal but has chosen to drop this particular challenge to the validity and enforcement of the policies.

1395kk-1(a)(4).  Section 1395u(a) authorizes the Centers for Medicare & Medicaid Services ("CMS"), the governmental agency established by the Secretary to administer the Medicare Program, to contract with MACs to administer substantial portions of the Medicare Program, including Part B of the Program.  And, Section 1395kk-1(a)(4) expressly empowers the MACs to establish LCDs.

Congress has established special provisions governing LCDs for clinical diagnostic laboratory tests as of 2015.  Under 42 U.S.C. 1395m-1(g), a MAC "shall only issue a coverage policy with respect to a clinical laboratory test in accordance with the process for making a local coverage determination . . . , including the appeals and review process for local coverage determinations under part 426 of title 42, Code of Federal Regulations."[10]

However, the provisions of Part 426 of title 42 do not address the *promulgation* process for LCDs.  Indeed, they are limited to the review of LCDs that have already been issued and are in effect.  42 C.F.R. 426.325(a).  In any event, this separate appeal process is available only to "aggrieved parties," *i.e.*, Medicare beneficiaries.  The beneficiaries may not assign their rights to others, including a Medicare provider or a supplier.  42 C.F.R. 426.110 and 426.320.

---

[10]  42 U.S.C. 1395ff(f)(2)(C) refers to Section 1395m-1(g) for provisions relating to LCDs for clinical laboratory testing.

The process is separate and distinct from the Medicare claims appeal process, the process Agendia must pursue to question LCDs. 42 C.F.R. 426.310. Importantly, in challenging the validity of an LCD under Part 426, an aggrieved party has the burden of proving through a preponderance of the evidence that the LCD is not "reasonable." 42 C.F.R. 426.110, 426.330, and 426.431. The reasonableness standard is a deferential level of review that sets the challenge bar very high.

In 2016, Congress added subdivision (*l*)(D)(5) to 42 U.S.C. 1395y. This provision regarding the promulgation of LCDs, in general, requires a MAC to make available on its website and on the Medicare Internet Website its "determination in its entirety;" information regarding where and when the proposed determination was first made public; hyperlinks to comments submitted to the contractor; and a summary of the evidence considered by the contractor and a list of the sources of such evidence.

### B.    The Present Litigation

The course of the administrative appeal process and the court proceedings below are discussed above and in the Secretary's opening brief. However, it is necessary to summarize briefly the district court's ruling on the delegation issue.

The district court canvassed some of the case law regarding the issue of whether Congress may delegate regulatory policymaking to a private party.  It compared the cases where the delegation was considered permissible to those where the delegation was considered impermissible.  E.R. 11-15, Dkt. 17, pages 13-17 of 66.

According to the district court, a line must be drawn between those situations where there is agency authority and supervision over the activities of the private parties and those where there is no "independent check."  The court concluded that the government agency, presumably CMS, has adequate "authority and surveillance over the activities" of the MACs with respect to LCDs.  The court so held despite the fact that the ALJ and the Appeals Council must give "substantial deference" to LCDs and the MACs' related policies.  The court noted that the ALJ and Appeals Council may disregard the MACs' policy so long as they explain the reason the policy was not followed.  E.R. 14, Dkt. Page 16 of 66.

## X.    <u>SUMMARY OF ARGUMENT</u>

Agendia recognizes the historical reluctance of the courts to invalidate Congressional delegations of regulatory policy making to other branches of the government, especially to executive branch agencies.  However, delegation of

regulatory authority to private entities, including private contractors, poses a very different issue, as the facts of this case demonstrate.

Here, a private insurance company, Palmetto GBA, a MAC, established Medicare policies in 2011 that impacted Medicare coverage for molecular diagnostic testing throughout the United States, as the facts of this case reveal. The policies included an LCD and a related technology assessment process developed by Palmetto, known as the MolDX program. Here, the policies were mechanically applied by the same contractor to deny coverage for every claim submitted by Agendia for every one of its BluePrint and TargetPrint tests.

If Agendia had not requested administrative appeals of each claim, the MAC policies would have become final and binding. And, throughout its administrative appeal process, Agendia was still required to confront and overcome the contractor's policies because the Secretary's ALJs and Appeals Council are required by regulation to give such policies "substantial deference" in the claims appeal process. Here, after she chose not to follow the MAC's policies, the ALJ found Agendia's claims to be covered and payable by Medicare under the controlling Medicare statutes and regulations. However, the Appeals Council reversed the ALJ's decision because the ALJ did not adequately defer to the MAC's coverage policies.

In essence, rather than exercising authority and surveillance over the MAC's policies in this case, the final government arbiter, the Appeals Council, acting on behalf of the Secretary, deferred to them. If the policies had actually been promulgated by the government agency, itself, here the Secretary or CMS, such deference might be appropriate. However, such deference is not appropriate for policies established solely by a private entity.

Congress invited and caused the Secretary to give such weight to LCDs and other MAC policies by delegating Medicare policy making authority, as opposed to merely ministerial responsibility, to the MACs. The Secretary obviously, but mistakenly, believed deference to private policy making is appropriate given the fact that Congress delegated such policy making to MACs in the first instance.

## XI.    STANDARD OF REVIEW

As the Secretary states (Dkt. 16, page 20 of 48), the Court reviews a district court's grant of summary judgment *de novo.* Moreover, the delegation question is a constitutional issue which is a pure question of law that requires this Court to review on a *de novo* basis.[11]

---

[11] The Appeals Council's decision is subject to review under the APA, 5 U.S.C. 706. *See* 42 U.S.C. 1395ff(b)(1)(A) and *Int'l Rehabilitative Scis.*, *Inc*. v *Sebelius*, 688 F.3d 994, 999 (9th Cir. 2012). Section 706 extends to determining whether the agency decision is contrary to a constitutional right, power or privilege.

5977450.1

## XII. ARGUMENT

### A. Congress May Not Delegate Discretionary Policymaking Authority to Private Entities

Agendia is not challenging Congress' delegation of authority to MACs with respect to the performance of *ministerial* functions. Indeed, the courts have upheld such challenges. For example, *see Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292 (D.C. Cir. 2013) (court upholds delegation of authority to MACs to use statistical extrapolation methods to determine the amounts of Medicare overpayments).

However, the establishment of Medicare coverage policies is not a ministerial function. Rather, such policymaking is clearly a discretionary function required to be performed by the legislative or quasi-legislative bodies of the *government*, such as Congress or government policy makers. The delegation of such authority to a private entity is "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). *See also Ass'n of Am. R.R. v United States DOT*, 721 F.3d 666, 670, 671-73 (D.C. Cir. 2013), *rev'd and vacated on other grounds*, *DOT v. Ass'n of Am. R.R.*, 135 S. Ct. 1225 (2015) (quoting this important holding from *Carter v. Carter Coal Co.* and adding that while private entities may provide non-discretionary services or make policy

proposals to an executive branch agency, they cannot make and enforce their own policies or perform discretionary functions that require no approval by the government agency).

More recently, in his concurring opinion in *DOT v. Ass'n. of Am. R.R.*, *supra*, 135 S. Ct. at 1237, Justice Alito emphasized that "there is not even a fig leaf of constitutional justification" for such delegation to private parties. He explained that "when citizens cannot readily identify the source of legislation or regulation that affects their lives, Government officials can wield power without owning up to the consequences." *Id.* at 135 S. Ct. at 1234, 1237. Not even the existence of "an intelligible principle" can rescue a statute "empowering private parties to wield regulatory authority." *See Sandvig v. Sessions*, 315 F. Supp. 3d 1, 32-33 (D. D.C. 2018). *See also Ass'n of Am. R.R. v United States DOT*, *supra*, 721 F.3d at 671.

In a concurring opinion in *Hays v. Sebelius*, 589 F.3d 1279, 1283 (D.C. Cir. 2009), Judge Randolf expressly raised the issue of whether Congress could constitutionally delegate to MACs the power to make Medicare policy through the development of LCDs. Judge Randolf concluded that it was "less than clear" that Congress could do so.

5977450.1

**B.** **There Is Not Sufficient Independent Check by the Secretary on MACs Establishment of LCDs to Allow the Delegation in This Case**

The district court did not address Justice Alito's or Judge Randolf's positions in the cases discussed above. Instead, the court found that there "is a sufficient independent check on the MACs through the claims appeal process that was fully utilized here" because the ALJs and the Council are not bound by LCDs. E.R. at 14; Dkt. No. 17, page 16 of 66. The court further held that even though the ALJs and the Appeals Council must afford the MACs' policies, including LCDs, substantial deference, the MACs do not occupy a position of authority where the agency is powerless to overrule their decisions. The court pointed out that ALJs and the Appeals Council are free to disregard LCDs so long as they explain reasons why the polices are not being followed, citing 42 C.F.R. 405.1062(b). *Id.*

The court did not address the fact that unappealed Medicare claims denials based on LCDs and other MAC policies are final. This means that the MACs' policies are binding for all Medicare claims, including those of Agendia, that are not appealed because the policies are binding on the MACs, themselves. And, the court's reasoning ignores 42 C.F.R. 405.1062(c), which prohibits ALJs and the Appeals Council from reviewing or setting aside an LCD in the claims appeals

26

process.  This means that Agendia has to appeal every claim denial.  And, Agendia must repeatedly go through the process on a claim-by-claim basis without regard to whether an ALJ or the Appeals Council rules in favor of Agendia on particular claims.

The existence of an appeal process available only to beneficiaries under Part 426 of Title 42 of the Code of Federal Regulations does nothing for Agendia and other clinical laboratories.  The process is not available to them.  And, even in the unlikely event a beneficiary decides to challenge a particular LCD, the deck is stacked against the beneficiary.  The beneficiary will have to show that a particular LCD is unreasonable – a standard that might be adequate for a duly enacted government regulation, but should not be, and is not, adequate for policies made by private contractors.

The record in this case contains evidence of how much unchecked authority Congress has (perhaps inadvertently) provided to MACs with respect to molecular diagnostic testing.  In *United States ex rel. Jeter v. Myriad Genetics, Inc.*, No. 17-cv-2945 (D.S.C. 2017), Palmetto's (the MAC at issue) former Medical Director, Elaine Jeter, M.D., acting on behalf of the United States in a False Claims Act case, explains that she "founded and directed Palmetto's" MolDX program in 2011.  Complaint, paras. 9 and 38, Supp E.R. at 12, 17-18.

In her complaint, Dr. Jeter describes in some detail the MolDX Program, including confirming that in 2011, Palmetto "establish[ed] a new policy whereby all MDTs [molecular diagnostic tests] brought to market are deemed non-covered until registered and MolDX has performed a technical assessment and made a determination of coverage." Complaint, para. 38, Supp. E.R. at 17-18. Dr. Jeter also points out the number of other MACs that have incorporated the MolDX Program into their Medicare coverage contracts and policies. Complaint, para. 40, Supp. E.R. at 18.

The complaint illustrates that not only do MACs believe they have the power to make Medicare coverage policies that are binding on MACs, but that those policies may establish standards for determining False Claims Act liability. In July 2019, Dr. Jeter's case was resolved by Myriad Genetic paying $9.1 million. Notice of Settlement, Supp. E.R. at 33. *See also U.S. ex rel. Alt v. Anesthesia Servs. Assocs, PLLC*, No. 16-cv-0549, 2019 U.S. Dist. LEXIS 223011, at *43-*46 (M.D. Tenn. Dec. 31, 2019) (listing decisions where courts have held that noncompliance with Medicare LCDs may give rise to False Claims Act Liability).

Essentially, Congress has given MACs the same authority it has given the Secretary to enact Medicare coverage policies. As the situation here demonstrates, and as Dr. Jeter's lawsuit shows, the MACs' policy making authority and

discretion are substantial and not subject to meaningful independent control by the Secretary.[12]

## XIII. **PRINCIPAL BRIEF CONCLUSION**

Based on the foregoing, Agendia respectfully contends that Congress has improperly delegated regulatory policy making authority to MACs, private contractors thus denying Agendia due process of the law.

Respectfully submitted,

s/_____
Patric Hooper (SBN 57343)
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Email: phooper@health-law.com

---

[12] Congress' delegation of untethered discretionary authority to MACs is also largely unchecked by any civil liability exposure. Under 42 U.S.C. 1395kk-1(d), the Secretary will indemnify a MAC and its medical director for such civil liability so long as they do not act criminally, fraudulently or grossly negligently.

5977450.1

## STATEMENT OF RELATED CASES

Counsel are not aware of any related appeals pending in the Ninth Circuit.

Respectfully submitted,

s/ _____

Patric Hooper (SBN 57343)
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 551-8111
Email:  phooper@health-law.com

5977450.1

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitation in Fed. R. App. Proc. 32(a)(7)(B), the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the typestyle requirements of Fed. R. App. Proc. 32(a)(6). The word processing program (Microsoft Office Word) used to prepare the brief reports that the brief is 5873 words long.  The brief has been prepared in a proportionally spaced typeface in Times New Roman 14-point font.

s/ _____
Patric Hooper

5977450.1

# ADDENDUM

# TABLE OF CONTENTS

**Statutes:**

42 USC 1395m-1(d).........................................................................................Add. 2

42 USC 1395m-1(g).........................................................................................Add. 4

42 USC 1395u(a) ............................................................................................Add. 5

42 USC 1395kk-1............................................................................................Add. 6

**Regulations:**

42 CFR 426.100 ............................................................................................Add. 15

42 CFR 426.110 ............................................................................................Add. 16

42 CFR 426.310 ............................................................................................Add. 18

42 CFR 426.320 ............................................................................................Add. 19

42 CFR 426.325 ............................................................................................Add. 20

42 CFR 426.330 ............................................................................................Add. 21

42 CFR 426.431 ............................................................................................Add. 22

5977450.1

Current through Public Law 116-142, approved June 5, 2020.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 161)  >
CHAPTER 7. SOCIAL SECURITY ACT (Titles I — XXI)  >  TITLE XVIII. HEALTH INSURANCE FOR THE
AGED AND DISABLED (§§ 1395 — 1395lll)  >  Part B. SUPPLEMENTARY MEDICAL INSURANCE
BENEFITS FOR THE AGED AND DISABLED (§§ 1395j — 1395w-6)*

## § 1395m-1. Improving policies for clinical diagnostic laboratory tests

**(d) Payment for new advanced diagnostic laboratory tests.**

    **(1)** Payment during initial period.

        **(A)** In general. In the case of an advanced diagnostic laboratory test for which payment has not been made under the fee schedule under section 1833(h) [*42 USCS § 1395l(h)*] prior to the date of enactment of this section [enacted April 1, 2014], during an initial period of three quarters, the payment amount for the test for such period shall be based on the actual list charge for the laboratory test.

        **(B)** Actual list charge. For purposes of subparagraph (A), the term "actual list charge", with respect to a laboratory test furnished during such period, means the publicly available rate on the first day at which the test is available for purchase by a private payor.

    **(2)** Special rule for timing of initial reporting. With respect to an advanced diagnostic laboratory test described in paragraph (1)(A), an applicable laboratory shall initially be required to report under subsection (a) not later than the last day of the second quarter of the initial period under such paragraph.

**(3)** Application of market rates after initial period. Subject to paragraph (4), data reported under paragraph (2) shall be used to establish the payment amount for an advanced diagnostic laboratory test after the initial period under paragraph (1)(A) using the methodology described in subsection (b). Such payment amount shall continue to apply until the year following the next data collection period.

**(4)** Recoupment if actual list charge exceeds market rate. With respect to the initial period described in paragraph (1)(A), if, after such period, the Secretary determines that the payment amount for an advanced diagnostic laboratory test under paragraph (1)(A) that was applicable during the period was greater than 130 percent of the payment amount for the test established using the methodology described in subsection (b) that is applicable after such period, the Secretary shall recoup the difference between such payment amounts for tests furnished during such period.

**(5)** Advanced diagnostic laboratory test defined. In this subsection, the term "advanced diagnostic laboratory test" means a clinical diagnostic laboratory test covered under this part that is offered and furnished only by a single laboratory and not sold for use by a laboratory other than the original developing laboratory (or a successor owner) and meets one of the following criteria:

> **(A)** The test is an analysis of multiple biomarkers of DNA, RNA, or proteins combined with a unique algorithm to yield a single patient-specific result.

> **(B)** The test is cleared or approved by the Food and Drug Administration.

> **(C)** The test meets other similar criteria established by the Secretary.

**(g) Coverage.**

> **(1)**Issuance of coverage policies.

>> **(A)**In general. A medicare administrative contractor shall only issue a coverage policy with respect to a clinical diagnostic laboratory test in accordance with the process for making a local coverage determination (as defined in section 1869(f)(2)(B)), including the appeals and review process for local coverage determinations under part 426 of title 42, Code of Federal Regulations (or successor regulations).

>> **(B)**No effect on National coverage determination process. This paragraph shall not apply to the national coverage determination process (as defined in section 1869(f)(1)(B)) [*42 USCS § 1395ff(f)(1)(B)*].

>> **(C)**Effective date. This paragraph shall apply to coverage policies issued on or after January 1, 2015.

> **(2)**Designation of one or more medicare administrative contractors for clinical diagnostic laboratory tests. The Secretary may designate one or more (not to exceed 4) medicare administrative contractors to either establish coverage policies or establish coverage policies and process claims for payment for clinical diagnostic laboratory tests, as determined appropriate by the Secretary.

Current through Public Law 116-142, approved June 5, 2020.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 161)  >  CHAPTER 7. SOCIAL SECURITY ACT (Titles I — XXI)  >  TITLE XVIII. HEALTH INSURANCE FOR THE AGED AND DISABLED (§§ 1395 — 1395lll)  >  Part B. SUPPLEMENTARY MEDICAL INSURANCE BENEFITS FOR THE AGED AND DISABLED (§§ 1395j — 1395w-6)*

## § 1395u. Provisions relating to the administration of part B

(**a**)The administration of this part [*42 USCS §§ 1395j* et seq.] shall be conducted through contracts with medicare administrative contractors under section 1874A [*42 USCS § 1395kk-1*].

*42 USCS § 1395kk-1*

Current through Public Law 116-142, approved June 5, 2020.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 161)  >*
*CHAPTER 7. SOCIAL SECURITY ACT (Titles I — XXI)  >  TITLE XVIII. HEALTH INSURANCE FOR THE*
*AGED AND DISABLED (§§ 1395 — 1395lll)  >  Part E. MISCELLANEOUS PROVISIONS (§§ 1395x —*
*1395lll)*

# § 1395kk-1. Contracts with medicare administrative contractors

**(a) Authority.**

　　**(1)**Authority to enter into contracts. The Secretary may enter into contracts with any eligible entity to serve as a medicare administrative contractor with respect to the performance of any or all of the functions described in paragraph (4) or parts of those functions (or, to the extent provided in a contract, to secure performance thereof by other entities).

　　**(2)**Eligibility of entities. An entity is eligible to enter into a contract with respect to the performance of a particular function described in paragraph (4) only if—

　　　　**(A)**the entity has demonstrated capability to carry out such function;

　　　　**(B)**the entity complies with such conflict of interest standards as are generally applicable to Federal acquisition and procurement;

　　　　**(C)**the entity has sufficient assets to financially support the performance of such function; and

　　　　**(D)**the entity meets such other requirements as the Secretary may impose.

　　**(3)**Medicare administrative contractor defined. For purposes of this title and title XI [*42 USCS §§ 1395* et seq. and *1301* et seq.]—

　　　　**(A)**In general. The term "medicare administrative contractor" means an agency, organization, or other person with a contract under this section.

　　　　**(B)**Appropriate medicare administrative contractor. With respect to the performance of a particular function in relation to an individual entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, a specific provider of services or supplier (or class of such providers of services or suppliers), the "appropriate" medicare administrative contractor is the medicare administrative contractor that has a contract under this section with respect to the performance of that function in relation to that individual, provider of services or supplier or class of provider of services or supplier.

　　**(4)**Functions described. The functions referred to in paragraphs (1) and (2) are payment functions (including the function of developing local coverage determinations, as defined in section 1869(f)(2)(B) [*42 USCS § 1395ff(f)(2)(B)*]), provider services functions, and functions relating to services furnished to individuals entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, as follows:

　　　　**(A)**Determination of payment amounts. Determining (subject to the provisions of section 1878 and to such review by the Secretary as may be provided for by the contracts) the amount of the

payments required pursuant to this title [*42 USCS §§ 1395* et seq.] to be made to providers of services, suppliers and individuals.

**(B)**Making payments. Making payments described in subparagraph (A) (including receipt, disbursement, and accounting for funds in making such payments).

**(C)**Beneficiary education and assistance. Providing education and outreach to individuals entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, and providing assistance to those individuals with specific issues, concerns, or problems.

**(D)**Provider consultative services. Providing consultative services to institutions, agencies, and other persons to enable them to establish and maintain fiscal records necessary for purposes of this title [*42 USCS §§ 1395* et seq.] and otherwise to qualify as providers of services or suppliers.

**(E)**Communication with providers. Communicating to providers of services and suppliers any information or instructions furnished to the medicare administrative contractor by the Secretary, and facilitating communication between such providers and suppliers and the Secretary.

**(F)**Provider education and technical assistance. Performing the functions relating to provider education, training, and technical assistance.

**(G)**Improper payment outreach and education program. Having in place an improper payment outreach and education program described in subsection (h).

**(H)**Additional functions. Performing such other functions, including (subject to paragraph (5)) functions under the Medicare Integrity Program under section 1893 [*42 USCS § 1395ddd*], as are necessary to carry out the purposes of this title [*42 USCS §§ 1395* et seq.].

**(5)**Relationship to MIP contracts.

**(A)**Nonduplication of duties. In entering into contracts under this section, the Secretary shall assure that functions of medicare administrative contractors in carrying out activities under parts A and B [*42 USCS §§ 1395c* et seq. and *1395j* et seq.] do not duplicate activities carried out under a contract entered into under the Medicare Integrity Program under section 1893 [*42 USCS § 1395ddd*]. The previous sentence shall not apply with respect to the activity described in section 1893(b)(5) [*42 USCS § 1395ddd(b)(5)*] (relating to prior authorization of certain items of durable medical equipment under section 1834(a)(15) [*42 USCS § 1395i-5(a)(15)*]).

**(B)**Construction. An entity shall not be treated as a medicare administrative contractor merely by reason of having entered into a contract with the Secretary under section 1893 [*42 USCS § 1395ddd*].

**(6)**Application of Federal Acquisition Regulation. Except to the extent inconsistent with a specific requirement of this section, the Federal Acquisition Regulation applies to contracts under this section.

**(b) Contracting requirements.**

**(1)**Use of competitive procedures.

**(A)**In general. Except as provided in laws with general applicability to Federal acquisition and procurement or in subparagraph (B), the Secretary shall use competitive procedures when entering into contracts with medicare administrative contractors under this section, taking into account performance quality as well as price and other factors.

**(B)**Renewal of contracts. The Secretary may renew a contract with a medicare administrative contractor under this section from term to term without regard to section 5 of title 41, United States Code [*41 USCS § 6101*], or any other provision of law requiring competition, if the medicare

administrative contractor has met or exceeded the performance requirements applicable with respect to the contract and contractor, except that the Secretary shall provide for the application of competitive procedures under such a contract not less frequently than once every 10 years.

(**C**)Transfer of functions. The Secretary may transfer functions among medicare administrative contractors consistent with the provisions of this paragraph. The Secretary shall ensure that performance quality is considered in such transfers. The Secretary shall provide public notice (whether in the Federal Register or otherwise) of any such transfer (including a description of the functions so transferred, a description of the providers of services and suppliers affected by such transfer, and contact information for the contractors involved).

(**D**)Incentives for quality.

 (**i**)In general. Subject to clauses (ii) and (iii), the Secretary shall provide incentives for medicare administrative contractors to provide quality service and to promote efficiency.

 (**ii**)Improper payment rate reduction incentives. The Secretary shall provide incentives for medicare administrative contractors to reduce the improper payment error rates in their jurisdictions.

 (**iii**)Incentives. The incentives provided for under clause (ii)—

  (**I**)may include a sliding scale of award fee payments and additional incentives to medicare administrative contractors that either reduce the improper payment rates in their jurisdictions to certain thresholds, as determined by the Secretary, or accomplish tasks, as determined by the Secretary, that further improve payment accuracy; and

  (**II**)may include substantial reductions in award fee payments under cost-plus-award-fee contracts, for medicare administrative contractors that reach an upper end improper payment rate threshold or other threshold as determined by the Secretary, or fail to accomplish tasks, as determined by the Secretary, that further improve payment accuracy.

(**2**)Compliance with requirements. No contract under this section shall be entered into with any medicare administrative contractor unless the Secretary finds that such medicare administrative contractor will perform its obligations under the contract efficiently and effectively and will meet such requirements as to financial responsibility, legal authority, quality of services provided, and other matters as the Secretary finds pertinent.

(**3**)Performance requirements.

 (**A**)Development of specific performance requirements.

  (**i**)In general. The Secretary shall develop contract performance requirements to carry out the specific requirements applicable under this title [*42 USCS §§ 1395* et seq.] to a function described in subsection (a)(4) and shall develop standards for measuring the extent to which a contractor has met such requirements. Such requirements shall include specific performance duties expected of a medical director of a medicare administrative contractor, including requirements relating to professional relations and the availability of such director to conduct medical determination activities within the jurisdiction of such a contractor.

  (**ii**)Consultation. In developing such performance requirements and standards for measurement, the Secretary shall consult with providers of services, organizations representative of beneficiaries under this title [*42 USCS §§ 1395* et seq.], and organizations and agencies performing functions necessary to carry out the purposes of this section with respect to such performance requirements.

(**iii**)Publication of standards. The Secretary shall make such performance requirements and measurement standards available to the public.

(**iv**)Contractor performance transparency. To the extent possible without compromising the process for entering into and renewing contracts with medicare administrative contractors under this section, the Secretary shall make available to the public the performance of each medicare administrative contractor with respect to such performance requirements and measurement standards.

(**B**)Considerations. The Secretary shall include, as one of the standards developed under subparagraph (A), provider and beneficiary satisfaction levels.

(**C**)Inclusion in contracts. All contractor performance requirements shall be set forth in the contract between the Secretary and the appropriate medicare administrative contractor. Such performance requirements—

(**i**)shall reflect the performance requirements published under subparagraph (A), but may include additional performance requirements;

(**ii**)shall be used for evaluating contractor performance under the contract; and

(**iii**)shall be consistent with the written statement of work provided under the contract.

(**4**)Information requirements. The Secretary shall not enter into a contract with a medicare administrative contractor under this section unless the contractor agrees—

(**A**)to furnish to the Secretary such timely information and reports as the Secretary may find necessary in performing his functions under this title [*42 USCS §§ 1395* et seq.]; and

(**B**)to maintain such records and afford such access thereto as the Secretary finds necessary to assure the correctness and verification of the information and reports under subparagraph (A) and otherwise to carry out the purposes of this title [*42 USCS §§ 1395* et seq.].

(**5**)Surety bond. A contract with a medicare administrative contractor under this section may require the medicare administrative contractor, and any of its officers or employees certifying payments or disbursing funds pursuant to the contract, or otherwise participating in carrying out the contract, to give surety bond to the United States in such amount as the Secretary may deem appropriate.

(**c**) **Terms and conditions.**

(**1**)In general. A contract with any medicare administrative contractor under this section may contain such terms and conditions as the Secretary finds necessary or appropriate and may provide for advances of funds to the medicare administrative contractor for the making of payments by it under subsection (a)(4)(B).

(**2**)Prohibition on mandates for certain data collection. The Secretary may not require, as a condition of entering into, or renewing, a contract under this section, that the medicare administrative contractor match data obtained other than in its activities under this title [*42 USCS §§ 1395* et seq.] with data used in the administration of this title [*42 USCS §§ 1395* et seq.] for purposes of identifying situations in which the provisions of section 1862(b) may apply.

(**d**) **Limitation on liability of medicare administrative contractors and certain officers.**

(**1**)Certifying officer. No individual designated pursuant to a contract under this section as a certifying officer shall, in the absence of the reckless disregard of the individual's obligations or the intent by that individual to defraud the United States, be liable with respect to any payments certified by the individual under this section.

**(2)**Disbursing officer. No disbursing officer shall, in the absence of the reckless disregard of the officer's obligations or the intent by that officer to defraud the United States, be liable with respect to any payment by such officer under this section if it was based upon an authorization (which meets the applicable requirements for such internal controls established by the Comptroller General of the United States) of a certifying officer designated as provided in paragraph (1) of this subsection.

**(3)**Liability of medicare administrative contractor.

**(A)**In general. No medicare administrative contractor shall be liable to the United States for a payment by a certifying or disbursing officer unless, in connection with such payment, the medicare administrative contractor acted with reckless disregard of its obligations under its medicare administrative contract or with intent to defraud the United States.

**(B)**Relationship to False Claims Act. Nothing in this subsection shall be construed to limit liability for conduct that would constitute a violation of sections 3729 through 3731 of title 31, United States Code.

**(4)**Indemnification by Secretary.

**(A)**In general. Subject to subparagraphs (B) and (D), in the case of a medicare administrative contractor (or a person who is a director, officer, or employee of such a contractor or who is engaged by the contractor to participate directly in the claims administration process) who is made a party to any judicial or administrative proceeding arising from or relating directly to the claims administration process under this title [*42 USCS §§ 1395* et seq.], the Secretary may, to the extent the Secretary determines to be appropriate and as specified in the contract with the contractor, indemnify the contractor and such persons.

**(B)**Conditions. The Secretary may not provide indemnification under subparagraph (A) insofar as the liability for such costs arises directly from conduct that is determined by the judicial proceeding or by the Secretary to be criminal in nature, fraudulent, or grossly negligent. If indemnification is provided by the Secretary with respect to a contractor before a determination that such costs arose directly from such conduct, the contractor shall reimburse the Secretary for costs of indemnification.

**(C)**Scope of indemnification. Indemnification by the Secretary under subparagraph (A) may include payment of judgments, settlements (subject to subparagraph (D)), awards, and costs (including reasonable legal expenses).

**(D)**Written approval for settlements or compromises. A contractor or other person described in subparagraph (A) may not propose to negotiate a settlement or compromise of a proceeding described in such subparagraph without the prior written approval of the Secretary to negotiate such settlement or compromise. Any indemnification under subparagraph (A) with respect to amounts paid under a settlement or compromise of a proceeding described in such subparagraph are conditioned upon prior written approval by the Secretary of the final settlement or compromise.

**(E)**Construction. Nothing in this paragraph shall be construed—

**(i)**to change any common law immunity that may be available to a medicare administrative contractor or person described in subparagraph (A); or

**(ii)**to permit the payment of costs not otherwise allowable, reasonable, or allocable under the Federal Acquisition Regulation.

## (e) Requirements for information security.

**(1)**Development of information security program. A medicare administrative contractor that performs the functions referred to in subparagraphs (A) and (B) of subsection (a)(4) (relating to determining and making payments) shall implement a contractor-wide information security program to provide information security for the operation and assets of the contractor with respect to such functions under this title [*42 USCS §§ 1395* et seq.]. An information security program under this paragraph shall meet the requirements for information security programs imposed on Federal agencies under paragraphs (1) through (8) of *section 3544(b) of title 44, United States Code* (other than the requirements under paragraphs (2)(D)(i), (5)(A), and (5)(B) of such section).

**(2)**Independent audits.

**(A)**Performance of annual evaluations. Each year a medicare administrative contractor that performs the functions referred to in subparagraphs (A) and (B) of subsection (a)(4) (relating to determining and making payments) shall undergo an evaluation of the information security of the contractor with respect to such functions under this title [*42 USCS §§ 1395* et seq.]. The evaluation shall—

**(i)**be performed by an entity that meets such requirements for independence as the Inspector General of the Department of Health and Human Services may establish; and

**(ii)**test the effectiveness of information security control techniques of an appropriate subset of the contractor's information systems (as defined in *section 3502(8) of title 44, United States Code*) relating to such functions under this title and an assessment of compliance with the requirements of this subsection and related information security policies, procedures, standards and guidelines, including policies and procedures as may be prescribed by the Director of the Office of Management and Budget and applicable information security standards promulgated under *section 11331 of title 40, United States Code*.

**(B)**Deadline for initial evaluation.

**(i)**New contractors. In the case of a medicare administrative contractor covered by this subsection that has not previously performed the functions referred to in subparagraphs (A) and (B) of subsection (a)(4) (relating to determining and making payments) as a fiscal intermediary or carrier under section 1816 or 1842 [*42 USCS § 1395h* or *1395u*], the first independent evaluation conducted pursuant to subparagraph (A) shall be completed prior to commencing such functions.

**(ii)**Other contractors. In the case of a medicare administrative contractor covered by this subsection that is not described in clause (i), the first independent evaluation conducted pursuant to subparagraph (A) shall be completed within 1 year after the date the contractor commences functions referred to in clause (i) under this section.

**(C)**Reports on evaluations.

**(i)**To the Department of Health and Human Services. The results of independent evaluations under subparagraph (A) shall be submitted promptly to the Inspector General of the Department of Health and Human Services and to the Secretary.

**(ii)**To Congress. The Inspector General of the Department of Health and Human Services shall submit to Congress annual reports on the results of such evaluations, including assessments of the scope and sufficiency of such evaluations.

**(iii)**Agency reporting. The Secretary shall address the results of such evaluations in reports required under *section 3544(c) of title 44, United States Code*.

**(f) Incentives to improve contractor performance in provider education and outreach.** The Secretary shall use specific claims payment error rates or similar methodology of medicare administrative contractors in the processing or reviewing of medicare claims in order to give such contractors an incentive to implement effective education and outreach programs for providers of services and suppliers.

**(g) Communications with beneficiaries, providers of services and suppliers.**

    **(1)**Communication strategy. The Secretary shall develop a strategy for communications with individuals entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, and with providers of services and suppliers under this title [*42 USCS §§ 1395* et seq.].

    **(2)**Response to written inquiries. Each medicare administrative contractor shall, for those providers of services and suppliers which submit claims to the contractor for claims processing and for those individuals entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, with respect to whom claims are submitted for claims processing, provide general written responses (which may be through electronic transmission) in a clear, concise, and accurate manner to inquiries of providers of services, suppliers, and individuals entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, concerning the programs under this title within 45 business days of the date of receipt of such inquiries.

    **(3)**Response to toll-free lines. The Secretary shall ensure that each medicare administrative contractor shall provide, for those providers of services and suppliers which submit claims to the contractor for claims processing and for those individuals entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, with respect to whom claims are submitted for claims processing, a toll-free telephone number at which such individuals, providers of services, and suppliers may obtain information regarding billing, coding, claims, coverage, and other appropriate information under this title.

    **(4)**Monitoring of contractor responses.

        **(A)**In general. Each medicare administrative contractor shall, consistent with standards developed by the Secretary under subparagraph (B)—

            **(i)**maintain a system for identifying who provides the information referred to in paragraphs (2) and (3); and

            **(ii)**monitor the accuracy, consistency, and timeliness of the information so provided.

        **(B)**Development of standards.

            **(i)**In general. The Secretary shall establish and make public standards to monitor the accuracy, consistency, and timeliness of the information provided in response to written and telephone inquiries under this subsection. Such standards shall be consistent with the performance requirements established under subsection (b)(3).

            **(ii)**Evaluation. In conducting evaluations of individual medicare administrative contractors, the Secretary shall take into account the results of the monitoring conducted under subparagraph (A) taking into account as performance requirements the standards established under clause (i). The Secretary shall, in consultation with organizations representing providers of services, suppliers, and individuals entitled to benefits under part A [*42 USCS §§ 1395c* et seq.] or enrolled under part B [*42 USCS §§ 1395j* et seq.], or both, establish standards relating to the accuracy, consistency, and timeliness of the information so provided.

        **(C)**Direct monitoring. Nothing in this paragraph shall be construed as preventing the Secretary from directly monitoring the accuracy, consistency, and timeliness of the information so provided.

**(5)**Authorization of appropriations. There are authorized to be appropriated such sums as are necessary to carry out this subsection.

**(h) Improper payment outreach and education program.**

**(1)**In general. In order to reduce improper payments under this title [*42 USCS §§ 1395* et seq.], each medicare administrative contractor shall establish and have in place an improper payment outreach and education program under which the contractor, through outreach, education, training, and technical assistance or other activities, shall provide providers of services and suppliers located in the region covered by the contract under this section with the information described in paragraph (2). The activities described in the preceding sentence shall be conducted on a regular basis.

**(2)**Information to be provided through activities. The information to be provided under such payment outreach and education program shall include information the Secretary determines to be appropriate, which may include the following information:

**(A)**A list of the providers' or suppliers' most frequent and expensive payment errors over the last quarter.

**(B)**Specific instructions regarding how to correct or avoid such errors in the future.

**(C)**A notice of new topics that have been approved by the Secretary for audits conducted by recovery audit contractors under section 1893(h) [*42 USCS § 1395ddd(h)*].

**(D)**Specific instructions to prevent future issues related to such new audits.

**(E)**Other information determined appropriate by the Secretary.

**(3)**Priority. A medicare administrative contractor shall give priority to activities under such program that will reduce improper payments that are one or more of the following:

**(A)**Are for items and services that have the highest rate of improper payment.

**(B)**Are for items and service that have the greatest total dollar amount of improper payments.

**(C)**Are due to clear misapplication or misinterpretation of Medicare policies.

**(D)**Are clearly due to common and inadvertent clerical or administrative errors.

**(E)**Are due to other types of errors that the Secretary determines could be prevented through activities under the program.

**(4)**Information on improper payments from recovery audit contractors.

**(A)**In general. In order to assist medicare administrative contractors in carrying out improper payment outreach and education programs, the Secretary shall provide each contractor with a complete list of the types of improper payments identified by recovery audit contractors under section 1893(h) [*42 USCS § 1395ddd(h)*] with respect to providers of services and suppliers located in the region covered by the contract under this section. Such information shall be provided on a time frame the Secretary determines appropriate which may be on a quarterly basis.

**(B)**Information. The information described in subparagraph (A) shall include information such as the following:

**(i)**Providers of services and suppliers that have the highest rate of improper payments.

**(ii)**Providers of services and suppliers that have the greatest total dollar amounts of improper payments.

**(iii)**Items and services furnished in the region that have the highest rates of improper payments.

**(iv)**Items and services furnished in the region that are responsible for the greatest total dollar amount of improper payments.

**(v)**Other information the Secretary determines would assist the contractor in carrying out the program.

**(5)**Communications. Communications with providers of services and suppliers under an improper payment outreach and education program are subject to the standards and requirements of subsection (g).

This document is current through the June 11, 2020 issue of the Federal Register. Title 3 is current through June 5, 2020.

*Code of Federal Regulations > TITLE 42 -- PUBLIC HEALTH > CHAPTER IV -- CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES > SUBCHAPTER B -- MEDICARE PROGRAM > PART 426 -- REVIEW OF NATIONAL COVERAGE DETERMINATIONS AND LOCAL COVERAGE DETERMINATIONS > SUBPART A -- GENERAL PROVISIONS*

## § 426.100 Basis and scope.

(**a**)Basis. This part implements sections 1869(f)(1) and (f)(2) of the Act, which provide for the review of LCDs, NCDs, and certain determinations that are deemed to be NCDs by statute.

(**b**)Scope. This subpart establishes the requirements and procedures for the review of LCDs and NCDs.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

Secs. 1102 and 1871 of the Social Security Act *(42 U.S.C. 1302* and 1395hh)

This document is current through the June 11, 2020 issue of the Federal Register. Title 3 is current through June 5, 2020.

*Code of Federal Regulations > TITLE 42 -- PUBLIC HEALTH > CHAPTER IV -- CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES > SUBCHAPTER B -- MEDICARE PROGRAM > PART 426 -- REVIEW OF NATIONAL COVERAGE DETERMINATIONS AND LOCAL COVERAGE DETERMINATIONS > SUBPART A -- GENERAL PROVISIONS*

# § 426.110 Definitions.

For the purposes of this part, the following definitions apply:

Aggrieved party means a Medicare beneficiary, or the estate of a Medicare beneficiary, who --

**(1)** Is entitled to benefits under Part A, enrolled under Part B, or both (including an individual enrolled in fee-for-service Medicare, in a Medicare+Choice plan, or in another Medicare managed care plan);

**(2)** Is in need of coverage for a service that is denied based on an applicable LCD (in the relevant jurisdiction) or an NCD, regardless of whether the service was received; and

**(3)** Has obtained documentation of the need by the beneficiary's treating physician.

Board means the Departmental Appeals Board.

Clinical and scientific experts mean experts that are consulted by the ALJ or Board as independent and impartial individuals, with significant experience and/or published work, pertaining to the subject of the review.

Contractor means a carrier (including a Durable Medical Equipment Regional Carrier), or a fiscal intermediary (including a Regional Home Health Intermediary) that has jurisdiction for the LCD at issue.

Deemed NCD means a determination that the Secretary makes, in response to a request for an NCD under section 1869(f)(4)(B) and (C) of the Act, that no national coverage or noncoverage determination is appropriate, or the Secretary's failure to meet the deadline under section 1869(f)(4)(A)(iv) of the Act.

New evidence means clinical or scientific evidence that was not previously considered by the contractor or CMS before the LCD or NCD was issued.

Party means an aggrieved party, which is an individual, or estate who has a right to participate in the LCD or NCD review process, and, as appropriate, a contractor or CMS.

Proprietary data and Privileged information means information from a source external to CMS or a contractor, or protected health information, that meets the following criteria:

**(1)** It is ordinarily protected from disclosure in accordance with 45 CFR part 164, under the Trade Secrets Act *(18 U.S.C. 1905)* or under Exemptions 4 or 5 of the Freedom of Information Act *(5 U.S.C. 552)* as specified in *45 CFR 5.65*.

**(2)** The party who possesses the right to protection of the information from public release or disclosure has not provided its consent to the public release or disclosure of the information. Any information submitted by the public that is not marked proprietary is not considered proprietary.

Reasonableness standard means the standard that an ALJ or the Board must apply when conducting an LCD or an NCD review. In determining whether LCDs or NCDs are valid, the adjudicator must uphold a challenged policy (or a provision or provisions of a challenged policy) if the findings of fact, interpretations of law, and applications of fact to law by the contractor or CMS are reasonable based on the LCD or NCD record and the relevant record developed before the ALJ or the Board.

Supplemental LCD/NCD record is a record that the contractor/CMS provides to the ALJ/Board and any aggrieved party and consists of all materials received and considered during a reconsideration. Materials that are already in the record before the ALJ/Board (for example, new evidence presented in the taking of evidence or hearing) need not be provided but may be incorporated by reference in the supplement to the LCD/NCD record. The contractor/CMS may provide statements, evidence, or other submissions to the ALJ/Board during the proceedings, as provided elsewhere in these regulations, but these submissions are not considered as supplementing the LCD/NCD record.

Treating physician means the physician who is the beneficiary's primary clinician with responsibility for overseeing the beneficiary's care and either approving or providing the service at issue in the challenge.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

Secs. 1102 and 1871 of the Social Security Act *(42 U.S.C. 1302* and 1395hh)

This document is current through the June 11, 2020 issue of the Federal Register. Title 3 is current through June 5, 2020.

*Code of Federal Regulations > TITLE 42 -- PUBLIC HEALTH > CHAPTER IV -- CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES > SUBCHAPTER B -- MEDICARE PROGRAM > PART 426 -- REVIEW OF NATIONAL COVERAGE DETERMINATIONS AND LOCAL COVERAGE DETERMINATIONS > SUBPART C -- GENERAL PROVISIONS FOR THE REVIEW OF LCDS AND NCDS*

## § 426.310 LCD and NCD reviews and individual claim appeals.

(**a**)LCD and NCD reviews are distinct from the claims appeal processes set forth in part 405, subparts G and H; part 417, subpart Q; and part 422, subpart M of this chapter.

(**b**)An aggrieved party must notify the ALJ or the Board, as appropriate, regarding the submission and disposition of any pending claim or appeal relating to the subject of the aggrieved party's LCD or NCD complaint. This reporting obligation continues through the entire LCD or NCD review process.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

Secs. 1102 and 1871 of the Social Security Act *(42 U.S.C. 1302* and 1395hh)

This document is current through the June 11, 2020 issue of the Federal Register. Title 3 is current through June 5, 2020.

*Code of Federal Regulations  >  TITLE 42 -- PUBLIC HEALTH  >  CHAPTER IV -- CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES  > SUBCHAPTER B -- MEDICARE PROGRAM  >  PART 426 -- REVIEW OF NATIONAL COVERAGE DETERMINATIONS AND LOCAL COVERAGE DETERMINATIONS  >  SUBPART C -- GENERAL PROVISIONS FOR THE REVIEW OF LCDS AND NCDS*

## § 426.320 Who may challenge an LCD or NCD.

**(a)**Only an aggrieved party may initiate a review of an LCD or NCD (including a deemed NCD), or provisions of an LCD or NCD by filing an acceptable complaint.

**(b)**Neither an ALJ nor the Board recognizes as valid any attempt to assign rights to request review under section 1869(f) of the Act.

## Statutory Authority

### AUTHORITY NOTE APPLICABLE TO ENTIRE PART:

Secs. 1102 and 1871 of the Social Security Act *[(42 U.S.C. 1302](#)* and 1395hh)

## [42 CFR 426.325](#)

This document is current through the June 11, 2020 issue of the Federal Register. Title 3 is current through June 5, 2020.

*Code of Federal Regulations > TITLE 42 -- PUBLIC HEALTH > CHAPTER IV -- CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES > SUBCHAPTER B -- MEDICARE PROGRAM > PART 426 -- REVIEW OF NATIONAL COVERAGE DETERMINATIONS AND LOCAL COVERAGE DETERMINATIONS > SUBPART C -- GENERAL PROVISIONS FOR THE REVIEW OF LCDS AND NCDS*

## § 426.325 What may be challenged.

**(a)**Only LCDs or NCDs (including deemed NCDs) that are currently effective may be challenged.

**(b)**Some items are not reviewable under this part, including the following:

**(1)**Pre-decisional materials, including --

**(i)**Draft LCDs;

**(ii)**Template LCDs or suggested LCDs; and

**(iii)**Draft NCDs, including national coverage decision memoranda.

**(2)**Retired LCDs or withdrawn NCDs.

**(3)**LCD or NCD provisions that are no longer in effect due to revisions or reconsiderations.

**(4)**Interpretive policies that are not an LCD or NCD.

**(5)**Contractor decisions that are not based on section 1862(a)(1)(A) of the Act.

**(6)**Contractor claims processing edits.

**(7)**Payment amounts or methodologies.

**(8)**Procedure coding issues, including determinations, methodologies, definitions, or provisions.

**(9)**Contractor bulletin articles, educational materials, or Web site frequently asked questions.

 (10) Any M+C organization or managed care plan policy, rule, or procedure.

**(11)**An individual claim determination.

**(12)**Any other policy that is not an LCD or an NCD as set forth in § 400.202 of this chapter.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

Secs. 1102 and 1871 of the Social Security Act *([42 U.S.C. 1302](#)* and 1395hh)

This document is current through the June 11, 2020 issue of the Federal Register. Title 3 is current through June 5, 2020.

*Code of Federal Regulations > TITLE 42 -- PUBLIC HEALTH > CHAPTER IV -- CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES > SUBCHAPTER B -- MEDICARE PROGRAM > PART 426 -- REVIEW OF NATIONAL COVERAGE DETERMINATIONS AND LOCAL COVERAGE DETERMINATIONS > SUBPART C -- GENERAL PROVISIONS FOR THE REVIEW OF LCDS AND NCDS*

## § 426.330 Burden of proof.

During an LCD or NCD review, an aggrieved party bears the burden of proof and the burden of persuasion for the issue(s) raised in a complaint. The burden of persuasion is judged by a preponderance of the evidence.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

Secs. 1102 and 1871 of the Social Security Act *(42 U.S.C. 1302* and 1395hh)

This document is current through the June 11, 2020 issue of the Federal Register. Title 3 is current through June 5, 2020.

*Code of Federal Regulations  >  TITLE 42 -- PUBLIC HEALTH  >  CHAPTER IV -- CENTERS FOR MEDICARE & MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES  > SUBCHAPTER B -- MEDICARE PROGRAM  >  PART 426 -- REVIEW OF NATIONAL COVERAGE DETERMINATIONS AND LOCAL COVERAGE DETERMINATIONS  >  SUBPART D -- REVIEW OF AN LCD*

## § 426.431 ALJ's review of the LCD to apply the reasonableness standard.

(**a**)Required steps. To review the provision(s) listed in the aggrieved party's complaint based on the reasonableness standard, an ALJ must:

(**1**)Confine the LCD review to the provision(s) of the LCD raised in the aggrieved party's complaint.

(**2**)Conduct a hearing, unless the matter can be decided on the written record.

(**3**)Close the LCD review record to the taking of evidence.

(**4**)Treat as precedential any previous Board decision under § 426.482 that involves the same LCD provison(s), same specific issue and facts in question, and the same clinical conditions.

(**5**)Issue a decision as described in § 426.447.

(**b**)Optional steps. The ALJ may do the following to apply the reasonableness standard to the provision(s) listed in the aggrieved party's complaint:

(**1**)Consult with appropriate scientific or clinical experts concerning evidence.

(**2**)Consider any previous ALJ decision made under § 426.447 regarding the same provision(s) of the LCD under review and for the same clinical conditions.

(**c**)Authority for ALJs in LCD reviews when applying the reasonableness standard. In applying the reasonableness standard to a provision (or provisions) of an LCD, the ALJ must follow all applicable laws, regulations, rulings, and NCDs.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

Secs. 1102 and 1871 of the Social Security Act *(42 U.S.C. 1302* and 1395hh)

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court

for the United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on June 18, 2020. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate

CM/ECF system.

s/_____
Patric Hooper

5977450.1